UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jonathan Corbett,
Plaintiff

v.

City of New York,
Sgt. Roberto More (Shield #934008),
Det. Michael Aherne (Shield #01073),
Sgt. Bryan Gillis (Ret.),
Defendants

**15-CV-9214 (GHW)**

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL RIGHTS ACT, N.Y. FREEDOM OF INFORMATION LAW, AND RELATED COMMON-LAW AND STATE CONSTITUTIONAL TORTS**

**JURY DEMANDED**

## SUMMARY

1. On February 7th, 2015, Plaintiff Jonathan Corbett ("CORBETT") reported the death of his girlfriend to the New York City Police Department ("NYPD").

2. Due to a lack of appropriate policies and training, and with no particularized reason of suspecting CORBETT of wrongdoing, CORBETT was transported to the police precinct without his consent and held for 3 hours, during which he reasonably felt he was not free to leave.

3. This failure to train has a devastating emotional impact on those who are freshly traumatized by the death of a loved one and constitute an unreasonable seizure of CORBETT's person, thus violating CORBETT's Fourth Amendment rights and creating a claim under the federal Civil Rights Act, 42 USC § 1983, as well as various state laws.

4. Subsequently, the NYPD unlawfully redacted or otherwise failed to provide records requested by CORBETT under New York's Freedom of Information Law, N.Y. P.B.O. §§ 84 – 90, relating to the incident above.

## JURY TRIAL

5. CORBETT demands a jury trial.

## PARTIES

6. CORBETT is an individual residing in Miami-Dade County, Florida, and a "part-year" resident of New York State.

7. Defendant City of New York is the city incorporated by and through the laws of the State of New York and is the entity responsible for its NYPD.

8. Defendant Sgt. Roberto More ("MORE") is and was at all times relevant a police officer employed by the NYPD. MORE was the supervisor on the scene that directed another officer[1] to detain and transport CORBETT. MORE is sued in his individual capacity.

9. Defendant Det. Michael Aherne ("AHERNE") is and was at all times relevant a police officer employed by the NYPD. AHERNE is one of two officers who questioned CORBETT at the precinct. AHERNE is sued in his individual capacity.

10. Defendant Sgt. Bryan Gillis ("GILLIS") was at all times relevant a police officer employed by the NYPD. GILLIS is the second of two officers who questioned CORBETT at the precinct. GILLIS is sued in his individual capacity.

## JURISDICTION & VENUE

11. This Court has subject matter jurisdiction under 42 USC § 1983 (the "Civil Rights Act") and 28 USC § 1331.

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1367 ("supplemental jurisdiction") over the state law claims related to the federal claims.

13. Venue is appropriate because Defendant City of New York is a city largely within the district boundaries for this Court and the NYPD is headquartered within this district.

14. Venue is further appropriate because NYPD rules require its officers, with limited exceptions, to reside within the City of New York, and therefore it is likely that Defendants MORE, AHERNE, and GILLIS also reside either within this district or at most a few miles to the east.

[1] Counsel for the City of New York has indicated that it cannot determine the identity of the officer who followed MORE's order to detain and transport CORBETT. As a result, this officer cannot be named in this complaint.

15. Finally, venue is appropriate because the incident that gave rise to the complaint occurred within the district boundaries for this Court.

## ALLEGATIONS OF FACT

### *The Morning of February 7th, 2015*

16. On February 7th, 2015, at 4:02 AM, CORBETT's girlfriend took her own life while on the phone with CORBETT.

17. Unsure of what he had heard on the phone, at that time CORBETT traveled to his girlfriend's apartment on West 33rd Street in Manhattan, arriving at the building at 4:16 AM.

18. CORBETT found his girlfriend unresponsive and called Defendant City of New York's NYPD, via its 911 system, to summon assistance at 4:19 AM.

19. The first officers[2] arrived on the scene at approximately 4:23 AM, and within 15 minutes there were at least 8 officers on the scene.

20. After CORBETT instructed the officers on how to reach his girlfriend, the officers asked for identification, and CORBETT produced his valid Florida driver's license, which was not immediately returned.

21. An officer then asked CORBETT to step into another room to discuss what had happened, which CORBETT did consensually and spoke with several officers.

22. However, at approximately 4:50 AM, MORE, who appeared to be a supervisor based on the fact that he was giving directions to other officers, instructed one of the officers to "take [CORBETT] back to the precinct."

23. Either MORE or another nearby officer then said to CORBETT something to the effect of, "Hold tight, this is going to be a long night for you."

24. At this point, it was clear to CORBETT that he was no longer free to go.

25. At no point did the officers ask for CORBETT's consent in any way to transport him to the police precinct.

[2] All references to "officers" herein are to police officers of the NYPD.

26. At no point until his release at approximately 7:20 AM did the officers inform, or do anything to suggest to, CORBETT that his participation was voluntary, and at all times CORBETT was directed, as opposed to requested, as to where to move or remain.

27. At the time that MORE ordered his subordinate to hold and transport CORBETT, he had neither an objective nor subjective good faith belief that CORBETT had committed a crime.

28. Adding to the emotional trauma, MORE and all other officers present repeatedly refused to answer CORBETT when he asked if his girlfriend was dead, or to allow him to speak to medical staff to get an answer.

29. Her death was confirmed to CORBETT by a civilian onlooker who told him that he overhead paramedics noting that his girlfriend was no longer with us.

30. CORBETT was directed into a squad car and transported to the Midtown South Precinct on West 35th Street in Manhattan by an officer per the order of MORE.

31. CORBETT did not believe he was at liberty to refuse this direction, and had he been *asked* to go to the precinct, or advised that he was free to go, instead of being *directed* to go to the precinct, he would have declined the invitation and instead would have immediately sought medical assistance and the comfort of friends and family.

32. CORBETT was directed into a back room of the precinct by this officer, and this officer was assigned to guard him at all times.

33. The officer guarding CORBETT was not a detective, did not ask CORBETT any questions, and served no purpose other than to ensure that CORBETT did not leave.

34. The NYPD does not require officers transporting individuals at the scene of a possible crime to document anything relating to the transportation, including documentation of who was transported, by whom, at what time, for what purpose, and whether the individual gave voluntary consent to the transportation.

35. CORBETT's transfer was not documented, and the NYPD now maintains that it has no idea of the identity of the officer who transported and guarded CORBETT.

36. Being under armed guard in the back of a police precinct, CORBETT continued to understand that he was not free to go.

37. The NYPD does not train its officers that in the described situation, whereby an individual may quite reasonably believe that he is not free to go, that they should advise the individual of his right to leave to avoid violating an individual's rights.

38. CORBETT waited in the room, with guard, for detectives to arrive for about 2 hours, save for a bathroom break during which the guarding officer followed CORBETT to the bathroom door and remained there to escort CORBETT back to the room.

39. During this time, CORBETT experienced excruciating emotional pain, having to process the shocking death of a loved one without the support of his friends, his family, or medical professionals, and instead being non-consensually locked away in the back of a police precinct.

40. Two detectives, AHERNE and GILLIS, arrived at approximately 6:50 AM.

41. When these detectives arrived, they were not informed as to whether CORBETT was present as a result of his own voluntary consent, and they made no inquiry into the matter.

42. No NYPD policies or training required these officers to make any such inquiry.

43. Instead, without informing CORBETT that he was free to go, these detectives questioned CORBETT for about half an hour.

44. The detectives finally informed CORBETT that he was free to go at approximately 7:20 AM.

45. After CORBETT was allowed to leave the room, an officer returned CORBETT's driver's license to him.

46. This timeframe indicates 2.5 hours of detention without consent.

47. At 6:50 AM, neither AHERNE nor GILLIS had an objective or subjective good faith belief that CORBETT had committed a crime.

48. In fact, before speaking with CORBETT, GILLS was already convinced, based on his observations at the scene of the incident, that no crime had occurred and the death of CORBETT's girlfriend was a suicide.

49. At no time did any of the at least 8 police officers on the scene (including MORE and the officer who transported and guarded CORBETT), the 2 detectives in the precinct (AHERNE and GILLIS), or any other police officers in the precinct attempt to intervene

or say or do anything to indicate that they thought that CORBETT's detention was anything other than standard procedure.

50. At no time was there anything to indicate to *any* officer that there was reasonable suspicion that CORBETT committed any wrongdoing.

51. At no time was there anything to indicate to *any* officer that there was probable cause that CORBETT committed any wrongdoing.

52. In fact, evidence was immediately available to prove that CORBETT was not in the building at the time of the death: the building is a luxury building with a doorman and cameras, either of which could have confirmed that CORBETT arrived approximately 15 minutes after a neighbor reported hearing his girlfriend scream[3], and further interviews with CORBETT's girlfriend's roommate *conducted before questioning CORBETT* confirmed that his girlfriend was dealing with serious depression and had attempted suicide in the past.

53. The Office of the Chief Medical Examiner subsequently ruled the death a suicide and the NYPD closed the case as such, without levying charges against any party.

54. CORBETT filed a timely Notice of Claim (*see* N.Y. GMU. LAW § 50-e) with the City of New York on April 17th, 2015.

## ***Public Records Request***

55. On or about August 27th, 2015, CORBETT filed a request for public records with the NYPD relating to the incident described *supra*.

56. The NYPD failed to produce any records whatsoever until November 12th, 2015, although it was required by state law to do so within 5 business days.

57. The records eventually produced by the NYPD were redacted, allegedly because "the release of such information would represent an unwarranted invasion of personal privacy and would endanger the life and safety of any person."

58. The deceased cannot have privacy interests, and CORBETT's request for records was with the consent of both the deceased's estate and next-of-kin, and was so noted in the request.

[3] The manner of death was a fall from a 31st floor apartment to an adjacent roof of a 7 story building. The neighbor who heard the scream was on the 8th floor. It is, therefore, certain that he heard her final voice, rather than a scream well prior to her death.

59. It is obvious that no one's life or safety would be endangered by releasing such records.

60. Further, the response was obviously missing records, *e.g.*, the response indicated that a video was in the possession of the NYPD but no video was included, nor were any handwritten officer notes included, despite CORBETT's recollection of officers taking notes during the time he was detained.

61. CORBETT filed a timely appeal with the NYPD regarding the redacted and missing records on December 10th, 2015.

62. The NYPD responded to CORBETT's appeal on January 29th, 2016, although it was required to do so with 10 business days.

63. The response indicated that they would continue to look for additional documents but would not provide redacted documents.

64. As of the date of the filing of this complaint, no additional documents have been received.

## CLAIMS FOR RELIEF

### Count 1: Civil Rights Act, 42 USC § 1983
***(Municipal Liability Predicated on Failure to Train )***

65. Defendant City of New York, as any municipality, is liable under federal law for the actions of its police officers when those officers act unlawfully due to the municipality's failure to train them.

66. CORBETT was transported and detained for 2.5 hours by the NYPD, with neither his consent nor probable cause.

67. While Defendant may make a colorable argument that they had reasonable suspicion of a crime[4], or were authorized to briefly detain CORBETT in an "investigative stop," the duration of the seizure plus the forced transportation of CORBETT far exceed the lawful boundaries of a stop predicated on reasonable suspicion or an investigative stop.

---

[4] CORBETT does not concede that there was reasonable suspicion to hold him. Rather, he points out that the more complicated question of reasonable suspicion is unnecessary to answer because the NYPD's actions were unlawful regardless of whether or not reasonable suspicion was present.

68. Any suspicion was weakened by the fact that CORBETT was the one who summoned police assistance, he led officers to the scene of the incident, he provided the officers with his identification, and he cooperated with the officers during the time before which it was clear that he was being detained.

69. While Defendant may argue that CORBETT's presence in the police station was voluntary, this argument fails because no reasonable person in CORBETT's shoes would have assumed that he was free to go under a totality of the circumstances – which included:

    a. CORBETT being directed, rather than asked, to enter a squad car for transport to the police precinct,
    b. CORBETT never being advised that he was free to go, nor the presence of any other indicator that he may leave,
    c. The context of being questioned before transportation regarding the death of his girlfriend,
    d. The advice of an officer that CORBETT should "Hold tight, this is going to be a long night for you,"
    e. The presence of an armed guard waiting with him in a room for no apparent purpose other than ensuring that CORBETT remain,
    f. The fact that CORBETT's guard even escorted him to the bathroom and waited at the bathroom door to return CORBETT to the back room,
    g. The fact that CORBETT was directed to wait for hours for the detectives to finish at the scene, rather than to simply return when they were ready, and
    h. The continued retention by the NYPD of CORBETT's driver's license during the period of detention.

70. Thus, the NYPD's detention of CORBETT was a violation of his Fourth Amendment rights under the U.S. Constitution.

71. Failing to train its officers as to what constitutes a detention, and/or to train its officers to advise individuals that they are free to go when failing to do so would lead a reasonable person to believe that they have been detained constitutes deliberate indifference to the rights of those who encounter the police force.

72. Failing to have, and enforce via proper training, a policy whereby documentation is created when civilians are transported from a potential crime scene, and failure to have a policy to indicate to the receiving officer, upon transfer of the civilian from one officer to another, whether or not the person has voluntarily consented to be present, *etc.*, constitutes a deliberate indifference bound to result in situations such as happened to CORBETT, where all officers (at least claim to) think a person is free to go, but because of the totality of the circumstances, he is not and thus his rights are violated.

73. The fact that the Defendant City of New York cannot even identify the officer who transported CORBETT to the police precinct demonstrates recklessness with their procedures for handling situations where an individual is detained but not charged.

74. CORBETT would not have been injured but for these failures, as proper training would have resulted in the officers, at a minimum, indicating to CORBETT that his presence was voluntary, at which point CORBETT would have left.

75. The City of New York is therefore liable to CORBETT for the actions of its officers who violated CORBETT's constitutional rights – including MORE, AHERNE, GILLIS, and the unnamed officer who transported and guarded CORBETT – as redressable by the Civil Rights Act, 42 USC § 1983.

**Count 2: Civil Rights Act, 42 USC § 1983**
***(Municipal Liability Predicated on Negligent Obstruction of Justice)***

76. The officer that transported and guarded CORBETT, in doing so, infringed upon CORBETT's rights under 42 USC § 1983 as described *supra*.

77. Defendant City of New York has been given ample time and warning by this Court to assist CORBETT in the identification of this officer. *See* D.E. #3.

78. The City of New York has indicated that they have been unable, and do not expect to be able, to identify this officer.

79. A police department has a duty to keep basic records about the whereabouts of its officers, as well as record whenever an officer detains an individual and transports him to a police precinct.

80. The City of New York either failed to keep such records, lost the records, or is intentionally withholding the records from CORBETT and the Court.

81. The City of New York pays judgments against its police officers, and covers their legal defense, even when those officers are sued individually.

82. Allowing the unnamed officer, and thus The City of New York which would have indemnified the officer in practice, to escape liability by failing to keep, maintain, and disclose basic records such as those which would identify the officer in question would frustrate the purposes of the Civil Rights Act, allowing police departments to insulate its officers by claiming not to know who was responsible.

83. The City of New York, therefore, also has municipal liability under 42 USC § 1983 for the actions of the officer that transported CORBETT[5].

**Counts 3 – 5: Civil Rights Act, 42 USC § 1983**

84. Defendants MORE, AHERNE, and GILLIS, together and separately, participated in violating CORBETT's rights as described above under ¶¶ 69 – 72.
85. Specifically:

    a. MORE directed his subordinate to violate CORBETT's rights by detaining him without lawful authority for what was clear to the officers on-scene to likely be "a long night," thus causing CORBETT to be so detained (Count 3).
    b. AHERNE and GILLIS knew, or should have known, that CORBETT was being unlawfully detained, and had the authority to immediately release him, but did not, and instead, continued to hold CORBETT until they had finished asking him questions and then, and only then, informed CORBETT that he was free to go, thus removing any possible remaining doubt that before that point he was not, in fact, free to go (Counts 4 and 5, respectively).

86. Defendants MORE, AHERNE, and GILLIS are therefore individually liable to CORBETT for violating his constitutional rights, as redressable by the Civil Rights Act, 42 USC § 1983.

**Counts 6 – 8: New York Constitution, Article I, § 12**

87. Defendants MORE, AHERNE, and GILLIS (Counts 6, 7, and 8, respectively), together and separately, participated in violating CORBETT's rights as described above under ¶¶ 69 – 71, 90.

88. Article I, § 12 of the New York Constitution prohibits "unreasonable searches and seizures" such as the seizure of CORBETT conducted by these defendants.

---

[5] As best Plaintiff's research has uncovered, Plaintiff is herein presenting an issue of first impression and asks the Court, in consideration of this charge, to extend the law of municipal liability under the Civil Rights Act. Plaintiff does so in good faith under Fed. R. Civ. P. Rule 11(b)(2)'s grant of permission to present a "nonfrivolous argument for extending" the law, and looks forward to arguing this position more fully should Defendant City of New York file a Rule 12(b)(6) motion regarding Count 2.

89. A damage remedy is necessary to effectuate this section of the New York Constitution and to ensure full realization of CORBETT's rights under this section.

**Counts 9 – 11: New York Constitution, Article I, § 5**

90. Defendants MORE, AHERNE, and GILLIS (counts 9, 10, and 11, respectively), together and separately, participated in violating CORBETT's rights as described above under ¶¶ 69 – 71, 90.

91. Article I, § 5 of the New York Constitution prohibits the unreasonable detention of witnesses.

92. To the extent that Defendants MORE, AHERNE, and GILLIS justify their holding of CORBETT as the holding of a witness, their actions were unreasonable due to the duration of the detention, forced transportation, and timing.

93. A damage remedy is necessary to effectuate this section of the New York Constitution and to ensure full realization of CORBETT's rights under this section.

**Counts 12 – 14: Conspiracy**

94. Defendants MORE, AHERNE, and GILLIS (Counts 12, 13, and 14, respectively), together and separately, participated in violating CORBETT's rights as described above under ¶¶ 69 – 71, 90.

95. These officers were in constant communication throughout the process, working with and directing each other, intentionally in furtherance of a policy that they knew, or should have known, violated CORBETT's rights.

96. MORE, AHERNE, and GILLIS are therefore liable to CORBETT under a theory of common-law conspiracy.

**Counts 15 – 17: Civil Assault**

97. During the entire incident, as described above under ¶¶ 69 – 71, 90, Defendants MORE, AHERNE, and GILLIS (Courts 15, 16, and 17, respectively) carried weapons and handcuffs.

98. CORBETT, reasonably, feared that any non-compliance would result in imminent bodily injury and physical restraint by any of the officers present.

99. The officers intended, through their words and actions, that CORBETT understand that if he tried to leave, he would imminently suffer bodily injury and physical restraint.

100. Defendants MORE, AHERNE, and GILLIS are therefore liable to CORBETT under a theory of common-law civil assault.

**Counts 18 – 20: False Imprisonment**

101. Defendants MORE, AHERNE, and GILLIS (Counts 18, 19, and 20, respectively), as described above under ¶¶ 69 – 71, 90, intentionally confined CORBETT against his will through words and conduct that made it clear that CORBETT would be physically prevented from leaving.

102. CORBETT was conscious of the confinement and did not consent to it.

103. There was no probable cause or other lawful authority to allow for the extended non-consensual transportation and confinement CORBETT encountered.

104. Defendants MORE, AHERNE, and GILLIS are therefore liable to CORBETT under a theory of common-law false imprisonment.

**Count 21: False Light Invasion of Privacy**

105. Defendant MORE, as described above under ¶¶ 69 – 71, 90, ordered CORBETT held without lawful authority.

106. As a result, CORBETT was detained in the lobby of a large residential building while on-lookers watched.

107. As a result, CORBETT was transported via a squad car on a street right next to Penn Station, in view of the large number of people that pass that area 24 hours per day.

108. In furtherance of that, MORE's subordinate, at MORE's direction, led CORBETT from the squad car into the precinct, in view of anyone walking by the precinct.

109. A reasonable person in the lobby of the apartment building may have concluded that the police thought that CORBETT was responsible for his girlfriend's death.

110. A reasonable person on the streets near Penn Station or the police precinct may have concluded that CORBETT was under arrest.

111. A reasonable person would, and CORBETT in fact does, find the implications expressed above in ¶¶ 114, 115, to be highly offensive.

112. Defendant MORE is therefore liable to CORBETT under a theory of common-law invasion of privacy for placing CORBETT under the false light that he was wrongfully involved in the incident described.

## Count 22: *Respondeat Superior*

113. Defendant City of New York, as any municipality in New York, is liable under state law for the actions of its police officers when those officers act within their scope of their employment and in furtherance of the interest of their masters.

114. As described *supra*, CORBETT was unlawfully detained for 2.5 hours and, resultantly, NYPD employees MORE, AHERNE, and GILLIS completed the various torts described herein against CORBETT.

115. MORE, AHERNE, and GILLIS were acting within the scope of their employment as officers of the NYPD, in furtherance of their employer's objectives.

116. So too was the unnamed officer who transported and guarded CORBETT, and the City of New York is liable for the actions of this officer as well.

117. CORBETT was damaged as a result of the torts of these employees of the City of New York.

## Count 23: Negligence

118. Defendant City of New York had a duty to train, supervise, screen, and discipline its officers to avoid the commission of torts against those who cross their paths.

119. The NYPD currently has failed to train its officers regarding appropriate guidelines for how to act in situations such as the one described in this complaint, constituting a breach of that duty.

120. But for the NYPD's failure to properly trained its officers, the situation described would not have happened and CORBETT would not have been injured

121. CORBETT was a foreseeable plaintiff within the zone of danger one could have foreseen would be impacted by a breach of this duty.

122. CORBETT was injured as a result of the City of New York's breach of this duty by officers who illegally seized him without the necessary probable cause.

## Count 24: New York Freedom of Information Law

123. The City of New York has an obligation under the State's Freedom of Information Law to promptly disclose records upon request.

124. CORBETT submitted a valid request for documents to the City of New York through its NYPD.

125. The NYPD, now 7 months later, has intentionally withheld some documents by redacting them and either intentionally or unintentionally withheld some documents by failing to include them in its response, and by failing to provide records in response to CORBETT's timely appeal.

126. The NYPD had no lawful basis for its withholding of the documents in question.

127. CORBETT is entitled to the production of the documents in question.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a) Declaratory relief stating that the NYPD had neither probable cause nor "arguable probable cause" that CORBETT had committed a crime.

b) Declaratory relief stating that the actions of Officers MORE, AHERNE, and GILLIS were unlawful, including: i) the forced transportation of CORBETT to the precinct, and ii) the duration of the detention.

c) Declaratory relief stating that the NYPD's failure to train its officers on how to lawfully deal with individuals in CORBETT's situation is unlawful.

d) Declaratory relief stating that the NYPD unlawfully withheld the documents requested by CORBETT.

e) Injunctive relief requiring the NYPD to adjust its policies regarding such situations and to properly (re-)train its officers of the new policy.

f) Injunctive relief requiring the production of documents as required by New York's Freedom of Information Law (Count 24)

g) Actual and punitive damages against the City of New York totaling the amount of $1,000,000.00 for the injuries in Counts 1, 22, and 23.

h) Actual and punitive damages against the City of New York totaling the amount of $1,000,000.00 for the injury in Count 2.

i) Actual and punitive damages against Officers MORE, AHERNE, and GILLIS in the amount of $1,000,000.00 <u>each</u> for their violation of CORBETT's rights under the Civil Rights Act, New York Constitution, and tort claims against them (Counts 3 – 20).

j) Actual and punitive damages against Officer MORE in the amount of $25,000 for the tort against CORBETT in Count 21.

k) Cost of the action.

l) Reasonable attorney's fees, should CORBETT retain an attorney[6].

m) Any other such relief as the Court deems appropriate.

Dated: New York, NY
October 19th, 2016

Respectfully submitted,

Jonathan Corbett
Plaintiff, *Pro Se*
228 Park Ave S., #86952
New York, NY 10003
E-mail: jon@professional-troublemaker.com

[6] CORBETT is presently representing himself in this action *pro se*, and is <u>not</u> seeking attorney's fees for any *pro se* work. CORBETT <u>only</u> seeks attorney's fees in the event that he retains an attorney at a later point, and only for the work completed by said attorney.